IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LYNDA THOMAS,                          )
                                       )
             Plaintiff,                )
                                       )
v.                                     )   No. CV-99-JEO-2603-S
                                       )
TARRANT CITY BOARD OF EDUCATION,       )
                                       )
             Defendant.                )

## MEMORANDUM OPINION

This matter is before the court on the defendant's motion for summary judgment filed on October 30, 2000. (Doc. 17).[1] Upon review of the motion, the evidentiary submissions and the briefs, the court finds that the motion is due to be granted.

## I. PROCEDURAL BACKGROUND

Lynda Thomas ("Thomas" or "the plaintiff") claims that the Tarrant City Board of Education ("the Board" or "the defendant") violated Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. §1981 by subjecting her to disparate working conditions, denying her a transfer, subjecting her to a racially hostile work environment and constructively discharging her.

On May 15, 2000, one of the plaintiff's attorneys filed a motion to withdraw. (Doc. 11). The motion noted that the plaintiff's other counsel, Jack Hollingsworth, would continue as counsel of record for the plaintiff. (*Id.*). The motion to withdraw was granted. (Doc. 13).

---

[1] References to "Doc.___" are to the documents as numbered by the clerk of court in the court's record of the case.

The defendant filed its motion for summary judgment on October 30, 2000. (Doc. 17). The defendant also filed evidentiary submissions in support of the motion for summary judgment. (Doc. 19). In response to the motion for summary judgment, the plaintiff's counsel filed a brief in opposition and an evidentiary submission. (Doc. 21 & 22). The defendant filed a reply brief in support of its motion. (Doc. 23).

On February 28, 2001, the court entered an order finding that, as of February 5, 2001, the plaintiff's attorney, Jack Hollingsworth, was suspended from the bar of this court and, therefore, was no longer qualified to represent the plaintiff. The court informed the plaintiff of her need to obtain new counsel and directed her to notify the court on or before March 23, 2001, as to whether she had obtained new counsel. The court further informed the plaintiff in the order that if she did not obtain counsel, she would be deemed to be proceeding *pro se* and that the case would proceed. (Doc. 24). After the court held three status conferences, the plaintiff decided that she would proceed *pro se*. (*See* Doc. 26-30; Courtroom notes dated April 11, 2001, April 30, 2001, May 14, 2001). On June 8, 2001, the court informed the plaintiff that the motion for summary judgment would be considered by the court after June 15, 2001. (Doc. 31). The plaintiff was again permitted an opportunity to file a response to the motion. (*Id.*). The parties have consented to the jurisdiction of the undersigned magistrate judge to hear this case. (Doc. 33 & 34).

## III. FACTUAL BACKGROUND[2]

The plaintiff, an African-American woman, was hired by the Tarrant City Board of Education in June 1998, as a child nutritionist. (Doc. 1 at ¶ 2; Thomas Depo.[3] at 53). During her employment, she worked under the supervision of Child Nutrition Program Manager Barbara Malone, a white female. (*Id.* at 56, 62). Other employees under Malone's supervision included Cheryl Fields, Kathy Nobles, Kathy Doss, and Bobbie Staton, all of whom are white. (*Id.* at 56). While the plaintiff worked in the lunchroom, the white employees, particularly Nobles, told her that the only reason that she was hired was because she was black, and that the lunchroom had not had a black employee in twenty-two years.[4] (*Id.* at 48-50, 56-57, 59, 156, 159). Nobles also criticized the plaintiff's job performance and told her that she was not properly trained.[5] She also told the plaintiff various negative things about the school system. (*Id.* at 50).[6] Fields and Doss simply did not speak to the plaintiff. (*Id.* at 62-63).

During her tenure with the defendant, the plaintiff was required to perform job duties which she stated that white employees did not have to perform, such as washing dishes and mopping the floors without any help. (Thomas Depo. at 83, 143, 186). When a white employee

---

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3] This deposition is located in the record at document 19, exhibit 3.

[4] The plaintiff stated that she did not at that time, however, believe that the system was prejudiced because she understood that there previously had been another minority employee. (*Id.* at 53-54).

[5] The plaintiff was trained only to wash dishes, which was her primary responsibility. (Thomas Depo. at 70).

[6] The plaintiff stated that Nobles told her that she (the plaintiff) could help "get rid" of Malone because she was black. (Thomas Depo. at 56-57). The plaintiff further stated that Nobles wanted Malone's job. (*Id.*).

was mopping, Malone would make the plaintiff stop her work and help the other person. (*Id.*). The plaintiff further claims that she was watched more closely than white employees and was subjected to higher job standards than white employees. (*Id.* at 91, 135, 138, 196-97). Specifically, she states that Malone would yell at her, but not the white employees, and that Malone referred to her on occasion as "you people." (*Id.* at 80, 86-89, 179). When the plaintiff complained to Malone that she was discriminating against her, they both cried and Malone told the plaintiff that she was "sorry that [the plaintiff] felt that way." (*Id.*). On one occasion, Malone mentioned to the plaintiff that the plaintiff's children had stopped speaking to her. The plaintiff then discussed this with her children and talked with Malone about it. Malone again said that "she was sorry." (*Id.* at 84-85).

The plaintiff states that she performed her job duties in an appropriate manner, yet she felt as though she was constantly harassed by Malone while similarly situated white employees were not. (Thomas Depo. at 91). By way of example, she complained that, during her last week at the school, she had to "put up [a lot of] food in the storage room and [she] had [to] do the dishes" as well. (*Id.* at 93, 186). She felt that this was because of her race. (*Id.*).

The plaintiff requested a transfer from the lunchroom to a position as custodian before Christmas 1998. (Thomas Depo. at 94-95, 111). She completed and submitted an application for the position on December 2, 1998. (*Id.* at 101). She stated that she was promised the job by Assistant Superintendent Rodney Kennemer. (*Id.* at 94). She wanted out of the cafeteria due to the stress[7] and the fact that the custodian was getting ready to retire. (*Id.* at 95). She did not tell

---

[7] The plaintiff was seen by her doctor during this period concerning an accident. She states that the medical records from the doctor demonstrate that she was experiencing stress and depression as a result of the discriminatory treatment. (*Id.* at 130).

4

Kennemer that she wanted to transfer because of discriminatory treatment in the cafeteria. (*Id.* at 96). She told him it was simply due to the stress of working in the cafeteria.[8] (*Id.*). Kennemer told her he heard about that. (*Id.* at 96-97). Kennemer then promised her the job. (*Id.* at 108-09). The plaintiff also was encouraged by the principal, Gayle Fox, to apply for the custodian position.[9] (*Id.* at 97-99). Fox told her that the custodian from the high school wanted the position, but if she did not get the job, then it was the plaintiff's. (*Id.* at 109-10). The plaintiff met with Dr. Fred Perkins, the school superintendent, two times about the transfer. (*Id.* at 102, 182). She told him about the way Malone was treating her. (*Id.* at 103, 179-80, 192). She also told him that Malone apologized and that she was going to try and work with Malone. (*Id.* at 104). Perkins asked if she knew about the Board's policy against discrimination. (*Id.* at 103). The plaintiff stated that she did not. (*Id.* at 103). Perkins then stated he was "surprised" about the situation in the cafeteria. (*Id.* at 104).

At some point, the plaintiff told Perkins that she would be forced to resign if she did not get the custodian's job because of the stress of working in the kitchen. (Thomas Depo. at 111, 183). He encouraged her to stay with the system and not to leave. (*Id.* at 112). The plaintiff submitted her resignation letter over the Christmas break by sliding the note under the door at the school. (*Id.* at 116). It provides:

> I, Lynda Thomas is [sic] going to resign 1-29-99 with [sic] T[arrant] E[lementary] S[chool] [sic] due to many reason[s] that I felt was not fair to me. Anyway, I learn[ed] a lot in the lunchroom. And I also learn[ed] I couldn't no [sic] longer work under the lunchroom manager. To to stressful [sic]. So I wanted an [sic]

---

[8] The plaintiff also told Pam Stembridge that things were "going okay" but "it could be better" in the cafeteria. (Thomas Depo. at 105).

[9] The principal, Gail Fox, designated this position as a "maid." (Doc. 19, Ex. 8).

5

> transfer that was denied. Why? I don't know. So I seen [sic] then my best bet is now to resign. Overall everything is okay. No hard feelings against no (sic) one. I will miss everyone at the kids was [sic] my joy. All days was [sic] not bad in the lunchroom. We had some very good days. We got along well (together). Ups and down [sic] come with each job. I know that. Please understand this was a very hard and painful decision for me. But I had to make it. Pam thank you so much to work for TES. [sic] So sweet and kind of all of you. But it just didn't work out for me. Dr. Perkins thank you also.

(Doc. 19, Ex. 6). On January 21, 1999, Fox recommended to Dr. Perkins that Cynthia Jackson, a black female, be employed in the custodial position at Tarrant Elementary. (Doc. 19, Ex. 8). The plaintiff's resignation was accepted by the defendant and Perkins made the recommendation to hire Jackson at the next Board meeting on January 26, 1999. (*Id.* at 112, 174; doc. 19, ex. 9). The Board hired Jackson with an effective starting date of January 27, 1999. (Doc. 19, Ex. 9).

The plaintiff filed an EEOC charge on February 2, 1999. (*Id.* at 193).

### III. SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 265 (1986).

Initially, the moving party bears the burden of proof "to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party can satisfy his burden by presenting evidence that there is no dispute of material fact, of by showing that the nonmoving party has failed to present evidence in support of some element of

her case on which she bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-323; *see* Fed. R. Civ. P. 56(a) and (b).

Should the moving party meet his burden of proof, "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment" *Clark*, 929 F.2d at 608. Material facts are those that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed, 2d 202 (1986). Genuine material facts are those material facts that could cause a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. The nonmoving party need not present evidence in a form necessary for admission at trial, however, the movant may not merely rest on the pleadings. *Celotex*, 477 U.S. at 324.

The court should consider the pleadings, depositions, and affidavits in the case before reaching its decision, and all reasonable inferences should be made in favor of the nonmovant. *Griesel v. Hamlin*, 963 F.2d 338, 341 (11th Cir. 1992). The judge's role is "not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III. DISCUSSION

#### A. Disparate Treatment

In a disparate treatment case such as this, where the claims are based upon circumstantial evidence of discrimination, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253-

54 & n.6, 101 S. Ct. 1089, 1094 & n.6, 67 L. Ed. 2d 207 & n.6 (1981); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir.), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997). The employer may rebut the *prima facie* case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff may overcome the employer's reasons by showing that they are but a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804.

The defendant asserts that the plaintiff cannot demonstrate a *prima facie* case against it with respect to her Title VII claims. To establish a *prima facie* case, the plaintiff must demonstrate that "(1) she is a member of a protected class; (2) she was subject to adverse employment action; (3) her employer treated similarly situated [white] employees more favorably; and (4) she was qualified to do the job." *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1310 (11th Cir.), *opinion superceded in part and on other grounds on denial of rehearing*, 151 F.3d 1321 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

With respect to her complaints about her working conditions, the plaintiff satisfies the first element because, as a black woman, she belongs to a protected class. *See Jones*, 137 F.3d at 1311. The plaintiff also appears to be qualified for the positions of child nutritionist and custodian due to her past work experience thereby satisfying the fourth *Maniccia* element. She cannot, however, satisfy the second prong of the *McDonnell Douglas* framework because she did not suffer an adverse employment action. The evidence is undisputed that she voluntarily resigned her employment after six months because the job was "to [sic] stressful." (Thomas at

Ex. 6; Thomas Depo. at 95).[10] There is no evidence in the record for this court to conclude that she was terminated by the defendant. To the contrary, the record demonstrates that the plaintiff's supervisors (other than Malone) attempted to persuade her not to resign. (See Thomas at 112).

The plaintiff also fails to satisfy the third *Maniccia* element because the evidence does not show that the defendant treated similarly situated white employees more favorably. Malone stated in her deposition that jobs are assigned according to experience. (Malone Depo. at 8-9).[11] According to Malone, the plaintiff was the newest member of the work force in the cafeteria and it was customary for those with the least experience to work in the dish room at the start of their employment. (Malone Depo. at 9, 13-14). The plaintiff does not dispute that she was the least senior employee, but instead asserts that her treatment was a result of her race. That the plaintiff had to take out the trash, wash dishes, and move boxes of food is consistent with her being the newest employee in the kitchen. Those tasks had to be performed and the plaintiff's status as a new employee warranted her performing such tasks. The court also notes that the plaintiff stated in her deposition that another white employee also had to mop the floor, but the plaintiff was required to assist.[12] (Thomas Depo. at 83, 143, 186).

Regarding the plaintiff's separate claim of discrimination relating to the denial of a transfer to the custodial position, that claim must fail as well. First, although not dispositive, the record demonstrates that the position was awarded to a black female, Cynthia Jackson. (Doc. 19,

---

[10] This letter also is found at Document 22, Exhibit 1 and Document 19, Exhibit 6.

[11] This document is located in the record at document 19, exhibit 5.

[12] Even assuming that the allegedly disparate task assignments in the cafeteria work are substantial enough to constitute an adverse employment action, it does not appear that the plaintiff was actually similarly situated to the other employees because she had less seniority and less experience.

9

Ex. 4 (Perkins Deposition), at 24). Second, the decision makers regarding that position were Fox, Perkins and the defendant Board–none of whom manifested any discriminatory intent against the plaintiff. To the contrary, the record demonstrates that Fox encouraged the plaintiff to apply for the custodian position (Thomas Depo. at 97-99, 109-10) and Perkins encouraged her to stay with the school system rather than resign (*id.* at 112).

### B. Hostile Environment Claim based Upon Race

Thomas asserts a hostile work environment claim. In order to establish a hostile environment claim, she must demonstrate (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on her race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatory abusive working environment; and (5) a basis for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citing *Henson v. Dundee*, 682 F.2d 897, 903-905 (11th Cir. 1982), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000).

The plaintiff does not meet those requirements for the reasons stated in the last section. Specifically, the court finds that the complained-of-actions are not sufficiently severe or pervasive to create an abusive working environment. Establishing the fourth *Mendoza* factor includes a subjective and an objective component. *Mendoza* 195 F.3d at 1246 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). The employee must "subjectively perceive" the harassing conduct as "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," and this perception must be objectively reasonable. *Id.* The employee's working

10

environment must be such that, considering all the circumstances, a reasonable person in the employee's position would consider it hostile and abusive, and the employee must subjectively believe it to be abusive as well. *Mendoza*, 195 F. 3d at 1246 (citing *Oncale v. Sundowner*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201, 208 (1998)).

The Eleventh Circuit has stated that "[t]he objective component of the severe and pervasive element prevents the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [ ] jokes, and occasional teasing from falling under Title VII's broad protections." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) (quoting *Faragher*, 524 U.S. at 778), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001). The statements and conduct complained of must be examined collectively to determine whether they meet the objective threshold for sufficiently severe or pervasive conduct which would satisfy the fourth *Mendoza* factor. *Gupta*, 212 F.3d at 583; *see also Mendoza*, 195 F.3d at 1246.

In determining the objective component of this analysis, the Supreme Court considers four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Harris*, 510 U.S. at 23; *Mendoza*, 195 F.3d at 1246 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)). The conduct should be considered in the totality of the circumstances, not in terms of isolated incidents, to determine "whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the employee's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246.

As noted previously herein, the plaintiff was the newest member of the work force in the cafeteria and it was customary for those with the least experience to work in the dish room at the start of their employment. (Malone Depo. at 13). The plaintiff does not dispute that she was the least senior employee. The fact that the plaintiff was required to perform other more menial tasks such as taking out the trash, washing the dishes, mopping the floors and moving boxes of food is consistent with her status in the kitchen as a new employee. The plaintiff has failed to present sufficient evidence indicating that such duty assignments were, in fact, based on her race rather than her seniority status. The other lunchroom employees all agreed that working in the lunchroom was stressful. (Doc. 19, Ex. 10, ¶ 2; Ex. 11, ¶ 4; Ex. 12, ¶ 4; Ex. 13, ¶ 2). The evidence also shows that Malone was harsh on all the cafeteria employees, regardless of their race. Malone's conduct, which included raising her voice at the plaintiff, as well as the other employees, and referring to the plaintiff as "you people," may have created a stressful environment, but the conduct was not sufficient under the circumstances to satisfy the fourth *Mendoza* element.

The plaintiff's allegation that the defendant had not hired any African Americans in twenty-two years is also insufficient. The record demonstrates that another black female, Jackie Carter, was hired the year before. (Malone Depo. at 12-13). Even if Carter was not hired and did not work for the defendant, that does not make establish the plaintiff's *prima facie* case. The plaintiff's hostile environment claim must fail.

### C. Constructive Discharge

"The threshold for establishing constructive discharge in violation of [Title VII] is quite high." *Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001). "To

successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were so intolerable that a reasonable person in [her] position would have been compelled to resign." *Id.* (quoting *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (quoting *Thomas v. Dillard Department Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997))) (internal quotations omitted); *see also Graham v. State Farm Mutual Insurance Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999) (citing *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993)); *Wardwell v. School Board of Palm Beach County*, 786 F.2d 1554, 1557 (11th Cir. 1986). "Before finding a constructive discharge, this court traditionally require[s] a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'" *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991) (citing *Wardwell*, 786 F.2d at 1558 (holding that an employer's failure to promote and consequent embarrassment to employee, together with employee's added workload, "simply do not rise to the intolerable level at which a reasonable person would feel compelled to resign")). Because the court must employ an objective, reasonable person standard, the plaintiff's subjective feelings are not determinative. *Graham*, 193 F.3d at 1284 (citing *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998)). The Eleventh Circuit has further held that "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) (italics in original).

    The allegations made by the plaintiff are again insufficient to state a claim. As stated already, while taking out the trash, mopping, and washing dishes are probably not pleasant tasks, they are certainly done on a daily basis by lunchroom employees. While the jobs given to the plaintiff may not have been pleasant, they were within the scope of work to be performed by a

new employee such as the plaintiff. These tasks are neither unreasonable or intolerable. The confrontations between the plaintiff and Malone were stressful and unprofessional on Malone's part, but they are insufficient to support a constructive discharge claim. Therefore, the plaintiff's claim must fail.

## IV. CONCLUSION

For the reasons set forth above, this court finds that the motion for summary judgment filed by the Tarrant City Board of Education is due to be granted. An appropriate order will be entered.

**DONE** this 29th day of November, 2001.

JOHN E. OTT
United States Magistrate Judge